**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **5AIF SYCAMORE 2, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO.** |
| | § | **1:19-cv-000431-RP** |
| **v.** | § | |
| | § | |
| **BEIT NES, LLC, MARILYN ROTH** | § | ***Consolidated with:*** |
| **EPSTEIN, and STEPHAN B. EPSTEIN** | § | **1:19-cv-000495-RP** |
| | § | |
| **Defendants.** | § | |

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Beit Nes took out a business-purpose, real-estate-secured loan, which Marilyn[1] personally guaranteed. Beit Nes defaulted, and Sycamore foreclosed. Now, to evade liability for the deficiency, Defendants falsely claim that the loan was actually made against their homestead. Because the undisputed evidence shows that it was not their homestead, all of Defendants' affirmative claims and defenses fail. Summary judgment should be entered for Sycamore on all claims.

### I.    SUMMARY JUDGMENT FACTS[2]

#### A.    History of the Epsteins at St. Stephens and Stonecliff.

In 1999, Marilyn purchased 31 St. Stephens School Road in Austin ("St. Stephens"), where she lived with her children and brother until 2003, when she married Stephan, who moved in with her.[3] In 2004, Stephan purchased St. Stephens from Marilyn with a $420,000 loan, and in December 2006 he took out a $584,000 home-equity loan.[4] In March 2007, Stephan purchased 7519 Stonecliff Drive in Austin ("Stonecliff"),[5] where Stephan, Marilyn, and her son moved and have continued to live, along with Marilyn's mother from 2010 to 2015, until late 2020.[6]

---

[1] For ease of reference, Sycamore refers to Marilyn and Stephan by their first names.

[2] Plaintiff's Appendix contains all the evidence cited in the Motion by page number ("App. ___").

[3] App. 243-44 ¶ 2; App. 543 (15:25-16:13); App. 718, 723-24 (13:10-18, 36:21-37:11).

[4] App. 251 ¶ 11; App. 244 ¶ 3; App. 261 n. 1, 291-93 ¶ 1-3, 297-301; *see also* App. 933-50.

[5] App. 399 n. 1, 2; App. 424-26 ¶¶ 1-2, 4; App. 429-37.

[6] App. 723-24, 726-28 (34:10-37:11, 39:24-40:6-17, 48:24-49:3, 55:7-14); App. 549 (38:8-9).

In August 2011, facing foreclosure on Stonecliff,[7] the Epsteins sold St. Stephens to a third party under a vendor's lien, but in February 2013 foreclosed and repurchased it after the buyer defaulted.[8] The Epsteins then tried again to sell St. Stephens to pay off the Stonecliff loan.[9] Meanwhile, the lender Nationstar restarted foreclosure efforts on Stonecliff, which Stephan blocked.[10] In June 2013, Nationstar determined St. Stephens was abandoned, changed the locks, and winterized the house.[11] In April 2015, the Epsteins sued Nationstar, alleging its actions turned away buyers, asserting that "[Stonecliff] is the [Epsteins'] homestead, and that the [Epsteins'] only means to reinstate [Stonecliff] is to use the proceeds of the sale of [St. Stephens]."[12] Litigation with Nationstar continued through May 2017.[13] During this time, the Epsteins never moved out of Stonecliff and leased St. Stephens in 2015 and from May 2017 through April 2018 while continuing to try to sell it.[14] Finally, in May 2017 the Epsteins settled with Nationstar, who agreed to modify and reinstate the Stonecliff loan and give the Epsteins 120 days from mid-May to pay off or refinance the St. Stephens loan, or Nationstar would be able to foreclose on St. Stephens.[15]

### B.    Marilyn tries to sell St. Stephens or find a new lender.

In July 2017, Marilyn again listed St. Stephens for sale and looked for new lenders.[16] On August 17, Marilyn emailed Kevin Puder at Barrington Capital, providing him details about St.

---

[7] App. 400-01 n. 10-12; App. 425-27 ¶¶ 1-2, 14-15; App. 420; App. 458-59.

[8] App. 552-53 (52:17-53-4); App. 612-14 (25:14-31:3); App. 635-43; App. 644-50.

[9] App. 552-54 (52:17-56:8); App. 675-77; App. 704-05; App. 252-55 ¶¶ 18, 20, 21, 33, 48-49.

[10] Nationstar Mortgage, LLC was assigned these loans in July 2012. App. 302-05, 380-81. *See also* App. 402 n. 21-29; App. 464-95; App. 252-55 ¶¶ 18, 20, 21, 33, 48-49; App. 1006-52.

[11] App. 252-55 ¶¶ 18, 20, 21, 33, 48-49.

[12] *Id.*; App. 552 (50:20-52:7). *See Epstein v. Nationstar Mortgage, LLC.*, No. D-1-GN-15-001399 (98th Dist. Ct. Travis Cnty., Tex.) (April 9, 2015).

[13] *See Stephan B. Epstein and Marilyn Epstein v. Nationstar Mortgage, LLC, et al.*, No. 1:15-CV-357-LY, ECF No. 6 (W.D. Tex. May 22, 2015); *see also Epstein*, No. D-1-GN-15-001399.

[14] App. 726-27 (48:24-49:3); App. 552-53, 555 (52:17-56:8, 63:19-64:10); App. 563-86; App. 587-88; App. 614-15 (35:24-37:23); App. 675-77; App. 704-05; *see also* App. 385-88.

[15] App. 682 (4:25-16:2); App. 675-77; App. 704-05; App. 707-10 (4:5-9:20); App. 711-14; App. 683 (18:11-19:6). *See* App. 711, 713-14; App. 683, 690 (18:11-19:6, 46:11-46:21).

[16] App. 555, 557 (61:16-63:6, 70:20-72:8); App. 563-86; App. 615 (35:24-37:23).

Stephens and what renovations she thought would attract buyers.[17] Marilyn submitted a loan application to Barrington, which stated that she wanted a one-year loan of $1,300,000, Stonecliff was her "Primary Residence," and her strategy was to "Fix/Clean up to prepare for better marketing [St. Stephens] to sell at the highest possible price."[18] On August 23, Puder updated the application to make Beit Nes the borrower and title holder.[19] Marilyn then forwarded him documents for Beit Nes, which Marilyn and Stephen (owning 90% and 10%, respectively) formed Beit Nes in 2012 to "buy and sell real estate, manage LLC owned assets including real estate and notes" and have used as such since 2012.[20] Marilyn then sent the Beit Nes documents to John Pleuthner, a title attorney she used, asking him to "make sure the title is ready for a quick close for 31 St. Stephens" because she was "working to get a quick refi asap…to save the property for selling soon" and would be transferring St. Stephens "from Steve and I individually, into my LLC, Beit Nes, LLC."[21]

On August 28, Marilyn sent Puder a "letter of explanation" about the issues they had faced with the Stonecliff and St. Stephens loans, describing her settlement with Nationstar that would leave Stonecliff, their "homestead," with an affordable loan, that they were ready to sell St. Stephens "for top dollar," and that "31 St Stephens is going to transfer from my husbands and my name (on deed) to my LLC, Beit Nes, LLC," explaining that "[t]his is my active and established LLC I use in order to do real estate transactions and that the Title Company is familiar with."[22]

But the Barrington loan fell through and Marilyn contacted David May, a broker, who introduced her to Byron Lusk of Sage Capital Management, a broker for investment-property

---

[17] App. 556-57 (68:6-72:8); App. 563-86.
[18] App. 558-60 (74:10-84:21); App. 589-97, 598-605; App. 608-12, 614-18 (8:4-25:13, 33:2-49:13); App. 627-34; *see also* App. 237-39, Nos. 8-17.
[19] App. 619-22 (52:7-54:15, 55:18-59:22, 61:14-65:15); App. 653-58.
[20] *Id.*; App. 659-73, 670; App. 239, Nos. 18-21; App. 665 § 1.6; App. 622 (63:1-65:25).
[21] App. 674; App. 615-16, 623-24 (37:24-38:14, 66:1-72:16).
[22] App. 675-77; App. 625 (74:-75:16); App. 680-82 (6:11-14:5).

loans.[23] On September 5, May sent Lusk a loan request for St. Stephens, stating that Marilyn would use the funds to "payoff balloon payment and cashout to fix up and sell."[24] Attached were details about the property and the Barrington application, which Lusk forwarded to Spencer Weaver, an advisor for 5 Arch Funding Corp., which only offers experienced investors business-purpose loans on nonowner-occupied or primary-residence real estate.[25] Lusk contacted Weaver because he knew 5 Arch could quickly put together the type of investment loan Marilyn requested.[26]

### C.   Marilyn proceeds with the 5 Arch loan.

Lusk then worked with Marilyn to gather information for 5 Arch's underwriting process through numerous emails and over 20 calls.[27] Marilyn provided information on Beit Nes, her extensive real-estate experience, and her plans for renovating St. Stephens to make it more attractive to buyers.[28] But during underwriting, 5 Arch discovered the foreclosure notices for Stonecliff and requested that Marilyn provide an "LOE" (letter of explanation).[29] Marilyn first sent Lusk the same LOE she had sent to Barrington, then sent another LOE focused on Stonecliff, explaining that she had settled with the lender to reinstate and modify that loan and there were no longer any issues with Stonecliff, "where I live," and since early 2011 she had been trying to sell St. Stephens and now she could "sell for top dollar."[30] 5 Arch relied on this information that Stonecliff, not St. Stephens, was her residence and would not have made the loan had it known otherwise.[31]

---

[23] App. 682-84 (16:5-22:14); App. 741-42, 744, 765-67 (13:5-15, 14:21-15:17, 25:15-25, 107:3-110:1, 114:17-20); App. 925 (64:2-10). Lusk is not an employee of 5 Arch or Sycamore. App. 741-44, 765-67 (13:5-15:17, 25:15-25, 107:3-110:1, 114:17-20); App. 925 (64:2-10).
[24] App. 503-39; App. 766 (110:2-111:5, 112:23-114:17);
[25] *Id.*; App. 785-821; App. 912, 926, 930 (10:18-12:17, 66:24-69:13, 84:24-85:11).
[26] App. 767 (114:21-115:13); *see also* App. 746, 752-53 (32:24-34:23; 57:22-58:7).
[27] App. 745-46, 773-73 (28:18-32:3-7, 141:18-142:3); App. 919, 925 (38:4-8; 39:8-40:3; 65:5-8).
[28] App. 770-72 (128:20-134:14, 136:13-137:23); App. 822, 838-42, 858-62, 863-64; App. 684-86 (24:25-24:16, 27:18-28:25, 29:1-32:10).
[29] App. 928-29 (76:6-78:18); App. 1006; App. 774-75 (144:9-148:3; 146:7-154:23); App. 894-99.
[30] App. 774-77 (146:7-155:23); App. 894-99; App. 675-77; App. 777 (154:24-157:18); App. 900-01; App. 689-70 (44:11-47:1); App. 706.
[31] App. 921, 926-31 (47:2-48:7, 68:1-69:13, 70:6-71:13, 73:18-75:25, 77:25-86:20); App. 951,

On September 12, the same day 5 Arch received a $2.5 million appraisal of St. Stephens, Marilyn asked her attorney to "put together the transfer document from us to Beit Nes, LLC for closing," even though for its Texas loans 5 Arch does not require the borrower to be an entity.[32] On September 14, the Epsteins executed a deed transferring St. Stephens from them to Beit Nes.[33]

Although 5 Arch and Texas National Title aimed to close on September 18 and were prepared to delay if needed, Marilyn insisted on the 18th because of the Nationstar deadline.[34] The Epsteins attended the closing presided over by the escrow officer, Kelly Clampitt, with no one from 5 Arch present.[35] After 5 Arch had to send new loan documents due to an error, the Epsteins signed the documents under Clampitt's explanations.[36] At closing, Marilyn executed for Beit Nes a $1,625,000 promissory note ("Note" or "Loan") at 9% interest payable in full on October 1, 2018.[37] Marilyn also personally guaranteed the Note ("Guaranty").[38] To secure the Loan, Beit Nes, the record owner, executed a deed of trust encumbering St. Stephens ("Deed of Trust").[39]

At closing, Marilyn also signed a "Homestead Affidavit and Disclaimer" disclaiming St. Stephens as her "homestead," instead identifying Stonecliff as her homestead.[40] Marilyn also signed an "Affidavit Concerning Business Purpose and Non-Owner Occupancy" ("Business Purpose Affidavit") affirming the Loan's purpose as business in nature, not personal, and affirming

---

952-88, 989-1005, 1053-59, 1060-103; App. 747-50, 752, 771-72 (37:17-40:16; 44:18-49:19, 56:13-57:16, 133:16-134:14); App. 3, 5, 6 ¶¶ 10, 16, 18; App. 858-62.

[32] App. 772-73 (137:25-141:15); App. 865-93; App. 591 (50:4-52:22); App. 706; App. 614, 615-16, 623-24 (30:23-32:11, 37:24-38:14, 66:1-72:16); App. 674; App. 916-17 (29:19-30:21).

[33] App. 1143, 1145 (53:25-55:3, 63:11-65:11); App. 1198-99; App. 239, Nos. 22, 23, 24; *see also* App. 543-46 (16:19-25:14); App. 622 (63:1-65:25).

[34] App. 1164-69; App. 1138-39, 1147 (33:25-39:11, 70:13-72:14); App. 779-80 (164:13-167:1); App. 692-93 (57:8-58:16).

[35] App. 692-95 (57:8-58:11; 65:25-66:5); App. 1170-72.

[36] App. 1179-85; App. 1186-1261; App. 1142-43 (49:11-54:20).

[37] App. 13-20; App. 4 ¶ 12; App. 240, Nos. 26, 27.

[38] App. 63-67; App. 6 ¶ 19; App. 241, Nos. 33, 39.

[39] App. 21-49; App. 4 ¶ 13; App. 56-57; App. 240, No. 28.

[40] App. 50-51; App. 5 ¶ 14; App. 240, Nos. 29, 30, 31.

that neither Beit Nes nor its principals, Marilyn and Stephan, has any intention of residing at St. Stephens.[41] 5 Arch relied on these statements as a condition to making the Loan and would not have made the Loan had Marilyn indicated St. Stephens was their homestead or residence.[42]

The loan funded the next day, with the prior lender, Mr. Cooper, receiving $840,453.58 to pay off its loans, and Beit Nes receiving $686,104.95, less commissions, 5 Arch's loan fees, and other costs.[43] Effective September 19, 2017, 5 Arch assigned all its interests in and obligations under the Deed of Trust, Note, and Guaranty, to Sycamore, who is the current owner and holder.[44]

### D. Beit Nes defaults and Sycamore forecloses on St. Stephens.

Beit Nes failed to pay the Loan balance when it matured on October 1, 2018.[45] Despite talks between 5 Arch and Marilyn about options after maturity,[46] 5 Arch decided to proceed to enforce the Loan.[47] On April 15, 2019, Sycamore gave notice that it was posting St. Stephens for non-judicial foreclosure on May 7, and the next day, the substitute trustee recorded and posted notice per Texas law.[48] On May 7, Sycamore foreclosed and purchased St. Stephens for an $800,000 credit bid based on appraisals $1,000,000 and $900,000 from October 2018 and January 2019, respectively.[49] Sycamore credited the $1,821,527.90 owed on the Note as of May 7, leaving a $1,021,527.90 deficiency accruing at 18% default interest, totaling $381,029.94 through June 3, 2021, plus post-foreclosure expenses of $25,194.64 for property taxes and $4,865.36 for insurance, plus legal fees.[50] Marilyn continue to possess St. Stephens despite Sycamore's eviction efforts.[51]

---

[41] App. 52-55; App. 5 ¶ 15; App. 241, No. 32.
[42] App. 5 ¶ 16; App. 50 ¶ 3; App. 52-53 ¶¶ 3, 4, 9; App. 31 § 11.
[43] App. 1196; App. 1143 (53:25-56:17); App. 6 ¶ 20.
[44] App. 63-67; App. 6-7 ¶¶ 22-24.
[45] App. 241, Nos. 37, 38; App. 199-200; App. 7-8, 10 ¶¶ 27, 42.
[46] App. 7-9 ¶¶ 26, 28, 32; App. 201-07; App. 1109-10, 1114-15 (21:11-23:1; 40:20-43:14).
[47] App. 8-9 ¶¶ 30, 33, 34; App. 1115, 1119 (42:19-43:14; 58:12-17).
[48] App. 9 ¶¶ 34, 36; App. 68-102; App. 103-04. See Tex. Prop. Code. § 51.002.
[49] App. 9 ¶ 37; App. 105-08; App. 10 ¶ 38; App. 109-49; App. 150-93.
[50] App. 10 ¶¶ 39, 40; App. 194-96, 197-98; App. 15 § 7(B); App. 38 § 27; App. 58.
[51] App. 10, 11 ¶¶ 43, 44, 46, 47. The possession judgment remains on appeal. *See Epstein v. 5AIF*

## II.    MOTION ON SYCAMORE'S CLAIMS

Sycamore is entitled to summary judgment against Marilyn Epstein and Beit Nes on the Loan and Guaranty. To enforce the Note, Sycamore must prove (1) Beit Nes signed the Note, (2) Sycamore is the owner of the Note, and (3) a certain balance is due and owing. *E.g.*, *Leavings v. Mills*, 175 S.W.3d 301, 309 (Tex. App.—Houston [1st Dist.] 2004, no pet.). To recover on a post-foreclosure deficiency, Sycamore must show (1) the amount due at foreclosure, (2) the foreclosure was valid, and (3) credit was given for the sale amount. *E.g.*, *Thompson v. Chrysler First Bus. Credit Corp.,* 840 S.W.2d 25, 28 (Tex. App.—Dallas 1992, no writ). To recover against Marilyn, Sycamore must prove (1) the existence of the Note and Guaranty, (2) Marilyn signed the Guaranty, (3) Sycamore owns the Guaranty, and (4) a balance remains owing on the Note. *E.g.*, *Vaughn v. DAP Fin. Serv's, Inc.*, 982 S.W.2d 1, 4 (Tex. App.—Houston [1st Dist.] 1997, no pet.).

Beit Nes defaulted on the Note and Deed of Trust when it failed to pay all amounts due at maturity.[52] Sycamore then exercised its power of sale to foreclose on St. Stephens and timely appointed the substitute trustee authorized to conduct the sale, which was properly and timely noticed, filed, and posted.[53] Sycamore purchased St. Stephens at the sale and credited Beit Nes's indebtedness.[54] Further, Marilyn executed the Guaranty and was notified of the amount due but failed to pay it.[55] Sycamore is the current owner of the Note, Deed of Trust, and Guaranty.[56]

There are no factual disputes on the above. Sycamore has thus established all the elements required to prove its deficiency claim, entitling it to summary judgment against Beit Nes and Marilyn for $1,021,527.90, plus $381,029.94 in default interest through June 3, 2021, plus $30,060.00

---

*Baobab, LLC and 5AIF Nutmeg REO, LLC*, No. 01-20-00313-CV (Tex. App—Houston [1st]).
[52] App. 240-41, Nos. 26-27, 37-38; App. 7, 9 ¶¶ 27, 33, 35; App. 14-15 § 3(A), 7(B); App. 38-39.
[53] *See* Part I.D, above; App. 9-10 ¶¶ 36-38; App. 38 § 27; App. 68-102, 103-04.
[54] App. 10 ¶¶ 39-40; App. 105-08.
[55] *See* Parts I.C, D, above; App. 9 ¶ 36; App. 58-62; App. 68-102, 103-04; App. 241, Nos. 33, 39.
[56] *See* App. 6-7 ¶¶ 22-24; App. 63-67.

in other post-foreclosure expenses, for a total of $1,432,617.84, excluding legal fees.[57]  The Court should also grant summary judgment that Beit Nes and Marilyn are liable for Sycamore's reasonable attorney's fees, collection costs, and expenses under the Note, Deed of Trust, and Guaranty, in amounts to be determined in accordance with Fed. R. Civ. P. 54(d).[58]

## III.    MOTION ON DEFENDANTS' COUNTERCLAIMS

 Sycamore also moves for summary judgment on Defendants' counterclaims because the evidence negates one or more of the elements of those counterclaims and/or there is no evidence.

### A.    Defendants' quiet title claim fails as St. Stephens was not their homestead.

Defendants allege that St. Stephens was their constitutional homestead at the time of Loan and thus the Deed of Trust and foreclosure were invalid. But as shown below, St. Stephens was not the Epsteins' homestead because it was both abandoned and alienated, and they are estopped from claiming it as their homestead based on their previous disclaimers, statements, and conduct.

#### 1.    St. Stephens was not the Epsteins' homestead at the time of the Loan.

The Texas Constitution protects the homestead from seizure and encumbrances except in a narrow range of circumstances. *See* Tex. Const., art. 16, § 50. The party seeking homestead protection has in initial burden to establish homestead status. *In re Saldana*, 531 B.R. 141, 156 (Bankr. N.D. Tex. 2015). To do this, "the claimant must have a possessory interest in the homestead he or she is claiming." *Id.* But mere ownership or possessory interest is not of itself sufficient to establish a homestead. *Id.* "A claimant must show both (i) overt acts of homestead usage and (ii) the intention on [her] part…to claim the land as a homestead." *Id.* What constitutes sufficient overt acts depends on the degree to which the acts reflect the claimant's subjective intent to make the property a homestead. *Matter of Claflin*, 761 F.2d 1088, 1091 (5th Cir. 1985). Mere subjective

---

[57] *See* Part I.D, above; App. 10 ¶¶ 40, 41.
[58] *See* App. 15 § 7(B); App. 38 § 27; App. 58; App. 10 ¶ 41.

intent without overt acts evidencing that intent is insufficient to establish a homestead. *Id.*

"Once property is designated as homestead property, it can lose that character only through abandonment, death, or alienation." *Thomas v. Graham Mortg. Corp.*, 408 S.W.3d 581, 588 (Tex. App.—Austin 2013, pet. denied). Abandonment requires discontinuance of the property's use plus intent to permanently abandon the homestead. *Resolution Trust Corp. v. Olivarez,* 29 F.3d 201, 207 & n.7 (5th Cir. 1994). Alienation occurs when the title is transferred to another. *Id.* at 206–07.

### a.      The Epsteins alienated St. Stephens' homestead status.

There is no evidence that St. Stephens was the Epsteins' homestead in September 2017. Though the Epsteins once lived at Stephens, they abandoned it in 2007 when they moved to Stonecliff, where they have since lived.[59] The Epsteins then sold St. Stephens in August 2011, which Marilyn admits was an undisputed alienation of St. Stephens.[60] *See id.* at 206-07. The Epsteins repurchased St. Stephens in 2013 and allege it became their homestead again by September 2017.[61] But because of the 2011 alienation, the Epsteins bear the burden to provide evidence of (1) overt acts of homestead usage and (2) the intent to claim St. Stephens as their homestead.

First, the Epsteins have no evidence they used St. Stephens as their homestead from 2013 to September 2017. In fact, the evidence disproves this. The Epsteins purchased Stonecliff in 2007, where they moved their family and have both lived continuously until November 2020, never moving back into St. Stephens.[62] Nationstar believed St. Stephens was abandoned in 2013 and 2014, it was occupied by tenant in 2015, and then leased again from May 2017 through April 2018.[63] Pictures Marilyn provided to 5 Arch and from the September 2017 appraisal show empty

---

[59] *See* Part I.A, above; *see also* Part III.A.1(b), below.
[60] App. 552-53 (52:17-53-4); App. 612-13, 620-21 (25:14-28:21, 56:22-59:20); App. 635-43.
[61] App. 552-53 (52:17-54:6); App. 613-14 (28:22-31:3); *see* App. 644-50.
[62] *See* Part I.A, above; App. 725-26, 728 (42:8-43:5, 48:24-49:3, 55:7-14); *see* Part I.A above.
[63] *See* Part I.A, above; App. 555 (63:19-64:10); App. 587-88.

rooms except for one unmade bed and a gutted master bathroom.[64] For over a decade the undisputed evidence shows no overt acts by the Epsteins to use St. Stephens as their homestead.

Second, the overwhelming evidence of the Epsteins' *actual* conduct and statements directly contradict any self-serving statements they may make of their claimed subjective intent to use St. Stephens as their homestead. The evidence shows their actual intent from 2011 through 2017 was to save Stonecliff by selling St. Stephens or borrowing funds to upgrade it for a future sale. For example, just after defaulting on their Stonecliff loan and facing foreclosure, the Epsteins sold St. Stephens in August 2011.[65] Then, after regaining St. Stephens in 2013, the Epsteins again tried to sell St. Stephens and even sued Nationstar in April 2015 for interfering with its potential sale.[66] In that suit, the Epsteins declared their intent to save Stonecliff, their "homestead," by selling St. Stephens, which efforts continued while that suit was active from 2015 to May 2017.[67]

Then, the Nationstar settlement in May 2017 gave the Epsteins what they wanted: a "lower interest long term loan on 7519 Stonecliff" and the ability to sell St. Stephens "for top dollar."[68] There is no evidence that at they ever considered selling Stonecliff, where they lived, to save St. Stephens. Further, none of the information provided to Lusk and 5 Arch, shows that the Epsteins were living in or intended to live in St. Stephens.[69] Rather, everything refers to Stonecliff as their primary residence where they lived, indicating their actual intent to eventually sell St. Stephens.[70]

The Epsteins subjective intent must be discerned from their *actual* conduct and statements, not unsupported, self-serving statements. *See, e.g.*, *Hinton v. Uvalde Paving Co.*, 77 S.W.2d 733 (Tex. Civ. App.—1934, writ ref'd) ("The existence, whether or not, of a homestead estate in

---

[64] App. 881-85; Part. II.B, above.
[65] *See* Part I.A, above.
[66] *See* Part I.A, above.
[67] *See* Parts I.A, above; App. 555 (63:19-64:10); App. 563-85, 587-88; App. 615 (35:24-37:23).
[68] App. 704-05; *see* Part A, C, above.
[69] *See* Parts A, B, above; App. 556 (68:1-72:8); App. 536-85.
[70] *See* App. 705; App. 676-77; Parts A, B, above.

property, must be determined from obvious facts, such as the use made of property, and cannot rest alone on intention or upon an asserted claim unaccompanied by any supporting fact or circumstance."). Here, the undisputed evidence proves that after they regained St. Stephens in 2013, the Epsteins did *not* engage in any overt acts to make it their homestead. Without overt acts manifesting the intent to make St. Stephens their homestead, the Epsteins' mere subjective intent as manifested in their unsupported, self-serving statements cannot alone establish a homestead. *See Matter of Claflin*, 761 F.2d at 1091. Summary judgment in Sycamore's favor is proper.

### b.    The Epsteins abandoned St. Stephens as their homestead.

The Epsteins also abandoned St. Stephens as their homestead. The best evidence of abandonment is that a new and permanent home has been acquired and occupied. *In re Comu*, 542 B.R. 371, 385 (Bankr. N.D. Tex. 2015) (citing *Coury v. Prot*, 85 F.3d 244, 254 (5th Cir. 1996)). This "could include the acquisition of another home, removal of the family from one dwelling to another, its occupancy and use as a homestead, and an absence of acts evidencing an intention to return to the former home." *Coury*, 85 F.3d at 254; *see also In re Comu*, 542 B.R. at 385.

The facts here are similar to *In re Comu*, where the court found abandonment when the family: (1) had resided at their claimed homestead for several years; (2) discontinued residing there and began renting it for income; (3) purchased another home, where they resided continuously for five years while the first property remained rented; and (4) discussed their desire to sell the first property. *In re Comu*, 542 B.R. at 387–88. The court found that "other than the purely self-serving statements made by the [family] that they intend to move back to the [first property]…there was no evidence of any specific acts actually demonstrating such intent." *Id.* at 388 (emphasis removed). The court thus found no facts supported the alleged intent to return to the claimed-homestead, such that they had abandoned their homestead. *Id.* & n. 92. Here, in 2007 the Epsteins purchased Stonecliff, where they moved their family and have lived continuously, while St. Stephens

was either sold, rented, or posted for sale.[71] As discussed above, no facts of their conduct or statements show their intent to reclaim St. Stephens as their homestead, but instead show the opposite intent to save Stonecliff by selling St. Stephens.[72] Sycamore has met its burden to prove abandonment such that St. Stephens was not the Epsteins' homestead in September 2017.

> ### c.   St. Stephens lost any homestead status when conveyed to Beit Nes.

St. Stephens also lost its homestead status when the Epsteins voluntarily conveyed it to Beit Nes on September 14, 2017.[73] "When a homestead is conveyed to a corporation, the stock of which is owned by the grantors, the property loses its homestead character regardless of whether the grantors continue to occupy the property." *In re Perry*, 345 F.3d 303, 311 (5th Cir. 2003) (citing *Eckard v. Citizens Nat'l Bank*, 588 S.W.2d 861, 862 (Tex. App.—Eastland 1979, writ ref'd n.r.e.) (homeowner could sell home to corporation so corporation could borrow money and put valid lien on property)).[74] "Valid title then vests in the corporation, and the property becomes subject to the debts of the corporation." *Id*. Therefore, the Epsteins lost their alleged homestead status as a matter of law when they transferred title to Beit Nes, and summary judgment for Sycamore is proper.

> ### d.   The Epsteins disclaimed St. Stephens' homestead status and are estopped from claiming it as their homestead.

The Epsteins are also estopped from claiming St. Stephens as their homestead because of the express disclaimers and because 5 Arch did not know of their purported use of the property. A lender may rely upon a non-homestead affidavit if it is without knowledge of the borrower's right to claim a homestead and the borrower is not in actual use and possession of the property. *In re Cadengo*, 370 B.R. 681, 696 (Bankr. S.D. Tex. 2007); Tex. Const. art. 16, § 50(d). "[A] change in

---

[71] *See* Part I.A, above.
[72] *See* Part III.A.1.a, above; App. 725 (42:8-43:5).
[73] App. 56-7.
[74] *See also In re Cole*, 205 B.R. 382, 385 (E.D. Tex. 1997) (homestead rights lost when property transferred to family limited partnership); *In re Whitcomb*, 617 B.R. 553, 563 (Bankr. S.D. Tex. 2020) (homestead rights lost when property transferred to LLC).

residence coupled with a disclaimer of the homestead may form the basis of a claim of abandon-ment by estoppel." *Thomas*, 408 S.W.3d at 589–90. "[W]hen physical facts open to observation lead to a conclusion that the property is not the homestead of the mortgagor, and its use is not inconsistent with the declarations made that the property is disclaimed as a homestead, and these declarations were intended to be and were actually relied upon by the lender, then the owner is estopped from asserting a homestead claim." *Id*. For example, in *Thomas*, the court found that the borrower was estopped from denying a homestead disclaimer relied on by the lender when the borrower told the lender he was trying to sell the claimed-homestead property and was now living elsewhere, and the lender inspected the property and found no sign of current occupation by the borrower. *Id* at 586, 590; *see also Matter of Rubarts*, 896 F.2d 107, 112 (5th Cir. 1990).

Here, in the Homestead Disclaimer, Business Purpose Affidavit, and Deed of Trust, Mari-lyn disclaimed St. Stephens as her family's homestead and instead declared it was Stonecliff.[75] This matched her earlier statements, especially in the LOE, where she stated that Stonecliff was purchased as their homestead and is "where I live."[76] Additionally, the information received showed St. Stephens, which the Epsteins were trying to sell, as almost empty and under various stages of renovation and disrepair.[77] 5 Arch relied on both the formal disclaimers and the other information received during underwriting in deciding to make the Loan.[78] Like *Thomas*, nothing indicated to 5 Arch that the Epsteins were using St. Stephens as their home. 5 Arch was thus justified in relying on Marilyn's disclaimers, and the Epsteins are estopped from now claiming the opposite to claim Stephens as their constitutionally-protected homestead.

---

[75] App. 2-3 ¶¶ 2, 4, 5, 6; App. 52 ¶¶ 4, 5, 6, 8; *see also* App. 27 § 6; App. 45 § 31(r).

[76] *See* Parts I.B, C, above; App. 928-29 (77:25-79:15); App. 269-70 (123:6-128:19); App. 785, 812-19; App. 1053-59.

[77] App. 785-89; App. 952-56; App. 866, 868, 880, 889, 881-85.

[78] App. 50 ¶ 3; App. 52 ¶¶ 1, 3, 9; App. 921, 928-31 (47:2-48:7, 77:25-79:15, 79:16-86:20) & App. 951-1103; App. 746-50, 769-72, 778-79 (32:24-34:23, 37:17-43:20, 48:10-18, 56:13-58:7, 133:16-134:14, 159:20-163:21) & App. 785-857, 902-05; App. 926 (68:1-69:13); s*ee also* Part I.C, above.

### 2.   The foreclosure of St. Stephens and the trustee's deed are valid.

Because St. Stephens was not the Epsteins' homestead as shown above, the foreclosure was valid along with the corresponding substitute trustee's deed. The Court should thus grant summary judgment and find that St. Stephens was not the Epsteins' homestead in September 2017, and that the subsequent foreclosure of St. Stephens and transfers were valid.[79]

### B.   Summary Judgment is proper on Defendants' fraud claims.

Defendants allege that Byron Lusk and Spencer Weaver, as agents for 5 Arch/Sycamore, made the following false statements to Marilyn to induce her to enter into the Loan, namely that:

1. Transferring St. Stephens to Beit Nes would not affect the Epsteins' homestead rights and that the Epsteins could continue to reside at St. Stephens after the Loan was made;

2. Sycamore would extend the Loan term for six months or refinance the Note at the end of the one-year term;

3. Prior to the Loan's maturity, Marilyn should not get another lender to refinance the Note because Sycamore would refinance the Note; and

4. The nature of the transaction was commercial, not residential, in order to circumvent the homestead equity lien provisions of the Texas Constitution.[80]

Based on the above, Defendants assert claims for common-law fraud, fraudulent inducement, and statutory fraud, claiming $1 million in lost equity when Sycamore foreclosed on St. Stephens.[81]

### 1.   Defendants' common-law and fraudulent-inducement claims fail.

For common-law fraud, Defendants must prove: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the

---

[79] If Sycamore's lien is declared invalid, Sycamore is entitled to subrogation for paying off the prior against St. Stephens in the amount of $840,453.58. *See Fed. Home Loan Mort. Corp. v. Zepeda*, 601 S.W.3d 763, 768 (Tex. 2020); App. ¶ 20; App. 47 § 37; App. 1196.
[80] Defs. 2nd Am. Compl. ¶¶ 59-63
[81] *Id.* ¶ 64

party acted in reliance on the representation; and (6) the party thereby suffered injury. *E.g.*, *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001). Fraudulent inducement has the same elements as common-law fraud, plus Defendants must show that they were fraudulently induced to enter into a binding agreement. *See Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 557 (Tex. 2019). Stephan's fraudulent inducement claim fails because he did not enter into any contractual obligation with Sycamore.[82] Defendants' fraud claims also fail as set forth below.

### a.  *No evidence of material misrepresentations by Lusk or Weaver.*

First, Defendants' fraud claims based on the alleged promises to extend or refinance the Note fail for lack of evidence. A representation about a future event is merely an opinion or prediction, not an actionable misrepresentation. *See Bryant v. Transcont'l Gas Pipe Line Co.*, 821 S.W.2d 187, 190 (Tex. App.—Houston [14th Dist.] 1991, writ denied). To prove a false promise of future performance, the plaintiff must show the defendant made a promise with no intention of performing it. *E.g.*, *Int'l Bus. Machs. Corp. v. Lufkin Indus.*, 573 S.W.3d 224, 228 (Tex. 2019). Defendants allege two misrepresentations regarding future events: (1) a pre-closing promise that 5 Arch would extend or refinance the Note when the term ended; and (2) a pre-maturity promise that 5 Arch would refinance the Note. Defendants have no evidence that 5 Arch made these alleged promises with no intention of performing them. To the contrary, 5 Arch actually considered a Note extension and/or refinance, but declined both when it received updated appraisals showing a lower value for St. Stephens.[83] Defendants' fraud claims fail on these grounds.

Second, Defendants' fraud claims fail because the alleged misrepresentations do not qualify as false statements of fact sufficient to support the second element of fraud. Generally, a representation about a point of law or the legal effect of a document is a statement of opinion, not an

---

[82] *See* App. 13-20, 21-14.
[83] App. 7-8 ¶¶ 26, 28, 29, 30; App. 1109-10, 1115, 1119 (21:11-23:1, 42:19-43:14; 58:12-17); App. 931 (88:12-23).

actionable misrepresentation. *Cheung-Loon, LLC v. Cergon, Inc.*, 392 S.W.3d 738, 746 (Tex. App.—Dallas 2012, no pet.). Exceptions to this rule include representations: (1) made by a party having superior knowledge who takes advantage of another's ignorance; (2) made as to legal rights where there is a fiduciary or confidential relationship; and (3) regarding legal rights if it was both intended *and* understood to be a representation of fact. *Id.* at 746. The last exception does not apply if the parties are in an equal bargaining position with equal access to legal advice. *Id.*

Defendants allege false statements about (1) the legal effect of transferring St. Stephens to Beit Nes and (2) the characterization of the loan as commercial to avoid homestead protections. Because both of the alleged misrepresentations are about the *legal* effect of the transfer and loan transaction, Defendants must provide evidence of one of the exceptions. *See id.* The first two exceptions do not apply. *See K3C Inc. v. Bank of Am., N.A.*, 204 Fed. App'x 455, 461 (5th Cir. 2006). (no fiduciary relationship between borrower and lender). There is also no evidence that Lusk or Weaver had any superior knowledge about Texas homestead protections any more than Marilyn did; to the contrary, neither is familiar with Texas home equity loans.[84] Finally, both parties were in an equal bargaining position with equal access to legal advice. In August 2017, Marilyn was already planning to use an LLC as the borrower and had so informed her title attorney to prepare the transfer to Beit Nes.[85] Marilyn thus had access to an attorney and could have sought legal advice about the effect of title transfer to Beit Nes when she asked her attorney to prepare it. Marilyn also has extensive real-estate experience and regularly uses LLCs in her transactions.[86] There is thus no evidence that 5 Arch had any superior knowledge or unequal bargaining power.

Accordingly, Defendants have no evidence of their claims that Lusk or Weaver's representations about the loan's effect on the Epsteins' purported homestead are actionable fraudulent

---

[84] App. 744 (22:5-25:25); App. 914-15 (21:16-23:22).
[85] App. 563; App. 674; App. 706; s*ee also* Part I.C, above.
[86] App. 543-45 (16:19-24:10); App. 822, 838-42; s*ee also* Parts I.C, D, above.

statements. The Court should grant summary judgment for Sycamore on this ground.

### b.    Evidence negates Defendants' justifiable reliance.

Defendants must also prove they actually *and* justifiably relied on the false representations. *E.g.*, *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 423–24 (Tex. 2015). Defendants' fraud claims also fail because Defendants could not have justifiably relied on the alleged statements about the effect of the transfer on their purported homestead status, ability to live at St. Stephens, or the commercial nature of the loan because these alleged statements directly contradict the terms of the loan documents. "[A]s Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Id.* at 424–25. "In this regard, a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citation omitted). "Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Id.* & n. 3 (citing cases); *see also Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 558 (Tex. 2019) (justifiable reliance elements may be negated as a matter of law when circumstances exist under which reliance cannot be justified).

Here, the Deed of Trust, Homestead Affidavit and Disclaimer, and Business Purpose Affidavit Marilyn signed at closing directly contradict Weaver and Lusk's allegedly false statements.[87] Each of these documents unambiguously state that the Loan is commercial in nature and that St. Stephens is not the Epstein's residence or homestead.[88] Even more, the information Marilyn

---

[87] App. 27 § 6; App. 45 § 31(r); App. 50 ¶ 2; App. 50-51 ¶ 6; App. 52-55;
[88] *See* App. 50 ¶ 4; App. 240, Nos. 30-32.

provided to Lusk and Weaver, as detailed above, contradicts their alleged false statements.[89] Defendants' cannot have justifiably relied on Lusk and Weaver's alleged statements under these circumstances.[90] Finally, the evidence negates Defendants' justifiable reliance on alleged promises to extend or refinance the Loan since the Note has does not contain any renewal or extension options, and states that it can only modified in writing.[91] Therefore, Defendants are unable to provide any evidence or create fact issues that their reliance was justifiable when the unambiguous loan documents and Marilyn's own statements contradict those alleged misrepresentations.

### c.    *Statute of frauds and Note provision bars fraud claims.*

Defendants' allegations regarding promises to extend or refinance the Note are also barred by the statute of frauds because the alleged promises are not in writing. *See* Tex. Bus. & Com. Code § 26.01(a) (promise regarding a debt must be in writing). Additionally, Section 11 of the Note states that it "may not be modified, amended, waived, extended, [or] changed… orally…but only by an agreement in writing signed by the party against whom enforcement…is sought."[92] When an oral agreement is rendered unenforceable by the statute of frauds, a party cannot sustain a fraud claim by merely alleging that the other party made an oral promise without the intention of performing it. *See McClure v. Duggan,* 674 F. Supp. 211, 221 (N.D. Tex. 1987). These alleged promises are not in writing.[93] Accordingly, summary judgment is proper dismissing these claims.

### d.    *Defendants have no evidence of fraud damages.*

Finally, Defendants have no evidence of damages. Sycamore has shown above that St. Stephens was not the Epsteins' homestead due its alienation and abandonment. Therefore, the Epsteins cannot have suffered any damages in reliance on the alleged misrepresentations about the

---

[89] *See* Parts I.C, III.A.1, above.
[90] *See* Part III.A.1, above.
[91] *See* App. 13-20.
[92] App. 16 § 11.
[93] Defs. 2nd Am. Compl. ¶¶ 60, 61 (ECF 30); App. 611 (19:23-21:6).

nature of the loan because Sycamore's lien was valid and enforceable against St. Stephens regardless of Lusk and Weaver's statements. Further, Defendants have no evidence that they would have actually been able to refinance the loan with another lender or were otherwise able to pay off the Loan by the maturity date. Defendants' fraud claims likewise fail on this element.

### 2. Statutory fraud claim fails as a matter of law.

Defendants' Section 27.01 statutory fraud claim fails because the Loan does not involve the *sale or transfer* of real property.[94] Section 27.01, "applies only to fraud in real estate or stock transactions." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343 (5th Cir. 2008) (claim that involved no real-property transaction failed as a matter of law) (citing *Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied) ("A loan transaction, even if secured by land, is not considered to come under the statute.").[95] Defendants' statutory fraud claim thus fails as a matter of law. *See Plunkett*, 27 S.W.3d at 611 ("Because there was neither a contract for, nor a sale of, land or stock between the parties involved in this case, § 27.01 does not apply.").

### C. Defendants' wrongful foreclosure claim fails.

The elements of a wrongful foreclosure claim are: (1) a defect in the foreclosure proceedings; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price. *E.g.*, *Foster v. Deutsche Bank Nat'l Tr. Co.*, 848 F.3d 403, 406 (5th Cir. 2017). Defendants allege that the foreclosure sale was defective because Sycamore did not first obtain a Rule 736 order permitting foreclosure of St. Stephens.[96] This argument fails.

---

[94] *See* Tex. Bus. & Com. Code  § 27.01(a)(1).

[95] *See also Greenway Bank & Trust of Houston v. Smith,* 679 S.W.2d 592, 596 ((Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) ("The statute makes no mention of any application to guaranty agreements, secured by real estate, or to a party who 'merely' loaned money for the purchase of real estate."); *Dorsey*, 540 F.3d at 343.

[96] Defs. 2nd Am. Compl. ¶¶ 72-75 (ECF 30). Rule 736 describe when a party must obtain court approval to foreclose on a Section 50(a)(6) home-equity lien. Tex. R. Civ. P. 735, 736.

First, Defendants presume that the Loan *should* qualify as a Section 50(a)(6) home-equity loan because St. Stephens was their homestead. But as shown above, St. Stephens was not the Epsteins' homestead in 2017. And even if were, neither Note nor the Deed of Trust purport to be subject to Section 50(a)(6).[97] Rather, the Deed of Trust grants Sycamore the power of non-judicial foreclosure and to foreclose Sycamore needed only to provide the required notices.[98] *See Univ. Savings, Ass'n v. Springwoods Shopping Ctr.*, 644 S.W.2d 705, 706 (Tex. 1982). Other than the lack of a Rule 736 order, Defendants have not alleged any other foreclosure defects.

Second, Defendants have no evidence of a grossly inadequate selling price. The $800,000 bid was based on appraisals of $1 million and $900,000, from October 2018 and January 2019.[99] *See Water Dynamics, Ltd. v. HSBC Bank USA, Nat. Ass'n*, 509 Fed. App'x 367, 369 (5th Cir. 2013) (foreclosure price exceeding 50% not grossly inadequate). Yet Defendants cite the September 2017 appraisal to argue $800,000 was grossly inadequate but offer no evidence why the more recent appraisals should be disregarded. There is also no evidence to show a causal connection between the alleged defect and the foreclosure price. Therefore, Defendants' wrongful foreclosure claims fails to provide evidence or create a fact issue. Summary judgment is proper.

### D.  Defendants are not entitled to declaratory relief.

Defendants also request declaratory relief that essentially mirrors their quiet title claim. Assuming declaratory relief is even proper,[100] the Court should grant summary judgment for Sycamore for the same reasons shown above that St. Stephens was not the Epsteins' homestead in 2017, and thus the Deed of Trust, Note, foreclosure, and subsequent transfers are all valid.

---

[97] *See* App. 13-20.
[98] *See* App. 21, 38-40 § 27; Tex. R. Civ. P. 736.9; Tex. Prop. Code § 51.002(d).
[99] *See* Part I.D, above.
[100] *See Stanley v. Walmart Stores, Inc.,* 839 F. Supp. 430, 435 (N.D. Tex. 1993) (granting summary judgment to dismiss declaratory judgment action when no justiciable controversy remained following dismissal of other claims).

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff 5AIF Sycamore 2, LLC thus respectfully requests that the Court grant this Motion and enter judgment against Defendants that:

1. Judgment against Defendants Beit Nes, LLC and Marilyn Roth Epstein for a total of $1,432,617.84, plus interest accrued through the date of judgment;

2. Plaintiff is entitled to recover its reasonable attorneys' fees, collection costs, and expenses from Defendants Beit Nes, LLC and Marilyn Roth Epstein;

3. Defendants Beit Nes, LLC, Marilyn Roth Epstein, and Stephan B. Epstein take nothing on their counterclaims and that the Court find on Defendants' counterclaims as set forth above;

4. Post-judgment interest as provided by law and costs of suit; and

5. Such other and further relief to which Plaintiff may be justly entitled.


Respectfully submitted,

**CLARK HILL STRASBURGER**

**TATE L. HEMINGSON**
State Bar No. 24064370
901 Main Street, Suite 6000
Dallas, Texas  75202
(214) 651-4300 (Telephone)
(214) 651-4330 (Fax)
themingson@clarkhill.com

*Attorney for Plaintiff 5AIF Sycamore 2, LLC*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on June 25, 2021, a true and correct copy of the foregoing was forwarded to all known counsel as follows:

James Minerve
The Minerve Law Firm
13276 N Hwy 183, Ste. 209
Austin, Texas 78750
jgminerve@aol.com
888-819-1440 Ext. 101 Office
888-230-6397 Fax
210-336-5867 Cell

Manotti L. Jenkins
Law Offices of Manotti L. Jenkins, LTD.
150 N. Michigan Ave., Suite 2800
Chicago, Illinois 60601
mj@mljlawoffices.com
312-208-9537 Tel
827-228-8153 Fax

*Attorneys for Defendants*

**TATE L. HEMINGSON**