# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **5AIF SYCAMORE 2, LLC,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **No. 1:19-CV-0431-RP**[1] |
| | § | |
| | § | |
| **BEIT NES, LLC, MARILYN ROTH** | § | |
| **EPSTEIN, and STEPHAN B.** | § | |
| **EPSTEIN,** | § | |
| *Defendants* | | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO:**    **THE HONORABLE ROBERT PITMAN**
       **UNITED STATES DISTRICT JUDGE**

Before the Court is Plaintiff's Motion for Summary Judgment, Dkt. 52. Despite being granted an extension of time to do so with a deadline of August 20, 2021, Defendants have failed to file a Response.[2] The District Court referred the Motion to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b) and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

---

[1] Consolidated with Case No. 1:19-cv-000495-RP. Dkt. 15.

[2] The undersigned notes that Defendants failed to file an Answer in this case. However, they filed a Second Amended Complaint in the consolidated companion case, and Sycamore addresses these claims as counterclaims in its motion. The undersigned follows Sycamore's motion and addresses these claims on the merits.

# I. Background

Plaintiff, 5AIF Sycamore 2, LLC, sues Defendants Beit Nes, LLC, Marilyn Roth Epstein, and Stephan B. Epstein to recover for deficient repayment on a loan contract and deed of trust secured by property located at 31 St. Stephens School Road in Austin, Texas. Dkt. 9. Defendants bring their own claims for fraud, wrongful foreclosure, quiet title, and a declaratory judgment. Dkt. 30 in 1:19-CV-495-RP. The following facts are uncontroverted.

Beit Nes, LLC, is a Texas limited liability company with two members, Marilyn Roth Epstein and Stephan B. Epstein. Dkt. 9. 5AIF Sycamore 2, LLC, is a Delaware limited liability company that acquired the loan contract and deed of trust through assignment. *Id.*

In 1999, Marilyn Epstein purchased 31 St. Stephens School Road, in Austin, Texas (St. Stephens). She lived there with her children and her brother until 2003, when she married Stephan Epstein, who moved into the residence. Dkt. 52-4, at 243-44. In 2004, Stephan Epstein purchased the residence from Marilyn with a $420,000 loan, and in December 2006 he took out a $584,000 home-equity loan against the property. Dkt. 52-4, at 244, 251; Dkt, 52-5, at 261, 291-93. In March 2007, Stephan Epstein purchased 7519 Stonecliff Drive in Austin (Stonecliff), where he, Marilyn Epstein, and her son moved and have continued to live, along with Marilyn's mother from 2010 to 2015, until late 2020. Dkt. 52-7, at 723.

In August 2011, facing foreclosure on Stonecliff, the Epsteins sold St. Stephens to a third party under a vendor's lien, but in February 2013 foreclosed and

repurchased it after the buyer defaulted Dkt. 52-6, at 552-53; Dkt. 52-7, at 635-43, 644-650. The Epsteins then tried again to sell St. Stephens to pay off the Stonecliff loan. Dkt. 52-6, at 552-54; Dkt. 52-7, at 675-77, 704-05. Meanwhile, Nationstar Mortgage, LLC, who was assigned these loans, Dkt. 52-5, at 302-05, restarted foreclosure efforts on Stonecliff, which Stephan blocked through obtaining a temporary restraining order. Dkt. 52-5, at 402, 465-95. In June 2013, Nationstar determined St. Stephens was abandoned, changed the locks, and winterized the house. Dkt. 52-4, at 252-55. In April 2015, the Epsteins sued Nationstar, alleging its actions turned away buyers, asserting that "[Stonecliff] is the [Epsteins'] homestead, and that the [Epsteins'] only means to reinstate [Stonecliff] is to use the proceeds of the sale of [St. Stephens]." Dkt. 52-4, at 250-59. Litigation with Nationstar continued through May 2017. *Stephan B. Epstein and Marilyn Epstein v. Nationstar Mortgage, LLC, et al.*, No. 1:15-CV-357-LY, at Dkt. 6 (W.D. Tex. May 22, 2015). During this time, the Epsteins never moved out of Stonecliff, and leased out St. Stephens. Dkt. 52-7, at 726-27; Dkt. 52-6, at 555. Finally, in May 2017 the Epsteins settled with Nationstar, who agreed to modify and reinstate the Stonecliff loan and give the Epsteins 120 days from mid-May to pay off or refinance the St. Stephens loan, or Nationstar would be able to foreclose on St. Stephens. Dkt. 52-7, at 682; Dkt. 52-7, at 676-77, 705, 708.

In July 2017, Marilyn Epstein again listed St. Stephens for sale and looked for new lenders. Dkt. 52-6, at 555-57. On August 17, 2017, Marilyn Epstein emailed Kevin Puder at Barrington Capital, providing him details about St. Stephens and

what renovations she thought would attract buyers. *Id.* Marilyn Epstein submitted a loan application to Barrington, which stated that she wanted a one-year loan of $1,300,000, Stonecliff was her "Primary Residence," and her strategy was to "Fix/Clean up to prepare for better marketing [St. Stephens] to sell at the highest possible price." Dkt. 52-7, at 610-12, 617. On August 23, 2017, Puder updated the application to make Beit Nes the borrower and title holder. Dkt. 52-7, at 619-22, 653-58. Marilyn Epstein then forwarded him documents for Beit Nes, showing Marilyn and Stephan Epstein (owning 90% and 10%, respectively) formed Beit Nes in 2012 to "buy and sell real estate, manage LLC owned assets including real estate and notes" and have used as such since 2012. Dkt. 52-7, at 659-73. Marilyn Epstein then sent the Beit Nes documents to John Pleuthner, a title attorney she used, asking him to "make sure the title is ready for a quick close for 31 St. Stephens" because she was "working to get a quick refi asap … to save the property for selling soon" and would be transferring St. Stephens "from Steve and I individually, into my LLC, Beit Nes, LLC." Dkt. 52-7, at 674.

On August 28, Marilyn Epstein sent Puder a "letter of explanation" about the issues they had faced with the Stonecliff and St. Stephens loans, describing her settlement with Nationstar that would leave Stonecliff, their "homestead," with an affordable loan, that they were ready to sell St. Stephens "for top dollar," and that "31 St. Stephens is going to transfer from my husband's and my name (on deed) to my LLC, Beit Nes, LLC," explaining that "[t]his is my active and established LLC I

use in order to do real estate transactions and that the Title Company is familiar with." Dkt. 52-7, at 675-77.

The Barrington loan fell through, Dkt. 52-7, at 682-83, and Marilyn Epstein contacted David May, a broker, who introduced her to Byron Lusk of Sage Capital Management, a broker for investment-property loans. *Id.* May sent Lusk a loan request for St. Stephens, stating that Marilyn Epstein would use the funds to "payoff balloon payment and cashout to fix up and sell." Dkt. 52-6, at 503-39. Attached were details about the property and the Barrington application, which Lusk forwarded to Spencer Weaver, an advisor for 5 Arch Funding Corp., which only offers experienced investors business-purpose loans on nonowner-occupied or primary-residence real estate. Dkt. 52-7, at 785-821. Lusk contacted Weaver because he knew 5 Arch could quickly put together the type of investment loan Marilyn Epstein requested. Dkt. 52-7, at 767.

Lusk then worked with Marilyn Epstein to gather information for 5 Arch's underwriting process through numerous emails and over 20 calls. Dkt. 52-7, at 745-46. Marilyn Epstein provided information on Beit Nes, Dkt. 52-8, at 822-837, her extensive real-estate experience, Dkt. 52-8, at 838-43, and her plans for renovating St. Stephens to make it more attractive to buyers. Dkt. 52-7, at 770-72; Dkt. 52-8, at 858-62. However, during underwriting, 5 Arch discovered the foreclosure notices for Stonecliff and requested that Marilyn Epstein provide an "LOE" (letter of explanation). Dkt. 52-9, at 1006. Marilyn Epstein first sent Lusk the same LOE she had sent to Barrington, Dkt. 52-7, at 675-77, then sent another LOE focused on

Stonecliff, explaining that she had settled with the lender to reinstate and modify that loan and there were no longer any issues with Stonecliff, "where I live," and since early 2011 she had been trying to sell St. Stephens and now she could "sell for top dollar." Dkt. 52-8, at 894-99. Arch relied on this information that Stonecliff, not St. Stephens, was her residence and would not have made the loan had it known otherwise. Dkt. 52-8, at 926.

On September 12, 2017, the same day 5 Arch received a $2.5 million appraisal of St. Stephens, Dkt. 52-8, at 865, Marilyn Epstein asked her attorney to "put together the transfer document from us to Beit Nes, LLC for closing." Dkt. 52-7, at 706. On September 14, the Epsteins executed a deed transferring St. Stephens from them to Beit Nes. Dkt. 52-11, at 1198.

Although 5 Arch and Texas National Title aimed to close on September 18, 2017, and were prepared to delay if needed, Dkt. 52-10, at 1164-69, Marilyn Epstein insisted on the 18th because of the Nationstar deadline. Dkt. 52-7, at 693. The Epsteins attended the closing presided over by the escrow officer, Kelly Clampitt, with no one from 5 Arch present. *Id.*, at 692-95. After 5 Arch had to send new loan documents due to an error, the Epsteins signed the documents (Loan) under Clampitt's explanations. Dkt. 52-10, at 1179-85; Dkt. 52-11, at 1186-1261. At closing, Marilyn Epstein executed for Beit Nes a $1,625,000 promissory note (Note) at 9% interest payable in full on October 1, 2018. Dkt. 52-2, at 13-20. Marilyn Epstein also personally guaranteed the Note (Guaranty). Dkt. 52-2, at 58-62. To secure the Loan,

Beit Nes, the record owner, executed a deed of trust encumbering St. Stephens (Deed of Trust). Dkt. 52-2, at 21-49.

At closing, Marilyn Epstein also signed a "Homestead Affidavit and Disclaimer" disclaiming St. Stephens as her "homestead," instead identifying Stonecliff as her homestead. Dkt. 52-2, at 50-51. Marilyn Epstein also signed an "Affidavit Concerning Business Purpose and Non-Owner Occupancy" (Business Purpose Affidavit) affirming the Loan's purpose as business in nature, not personal, and affirming that neither Beit Nes nor its principals, Marilyn and Stephan Epstein, has any intention of residing at St. Stephens. Dkt. 52-2, at 52-55. 5 Arch relied on these statements as a condition to making the Loan and would not have made the Loan had Marilyn Epstein indicated St. Stephens was their homestead or residence. Dkt 52-2, at 5, 50-51.

The Loan funded the next day, with the prior lender, Mr. Cooper, receiving $840,453.58 to pay off its loans, and Beit Nes receiving $686,104.95, less commissions, 5 Arch's loan fees, and other costs. Dkt. 52-11, at 1196. Effective September 19, 2017, 5 Arch assigned all its interests in and obligations under the Deed of Trust, Note, and Guaranty, to Sycamore, who is the current owner and holder. Dkt. 52-2, at 63-67.

Beit Nes failed to pay the Loan balance when it matured on October 1, 2018. Dkt. 52-4, at 199, 241. Despite talks between 5 Arch and Marilyn Epstein about options after maturity, Dkt. 52-4, at 201-07, 5 Arch decided to proceed to enforce the Loan. Dkt. 52-2, at 8-9. On April 15, 2019, Sycamore gave notice that it was posting

St. Stephens for non-judicial foreclosure on May 7, 2019, and the next day, the substitute trustee recorded and posted notice per Texas law. Dkt. 52-2, at 68-103. Sycamore then foreclosed and purchased St. Stephens for an $800,000 credit bid, Dkt. 52-3, at 105-08, based on appraisals $1,000,000 and $900,000 from October 2018 and January 2019, respectively. Dkt. 52-2, at 8. Sycamore credited the $1,821,527.90 owed on the Note as of May 7, leaving a $1,021,527.90 deficiency accruing at 18% default interest, totaling $381,029.94 through June 3, 2021, plus post-foreclosure expenses of $25,194.64 for property taxes and $4,865.36 for insurance, plus legal fees. *Id.*, at 10. Marilyn Epstein continues to possess St. Stephens despite Sycamore's eviction efforts. *Id.*, at 10-11.

## II.    Standard of Review

Sycamore now moves for summary judgment on all claims, including Defendants' affirmative claims and defenses. Defendants have not filed a response.

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). This rule applies equally to affirmative defenses—plaintiffs are entitled to summary judgment if they produce sufficient evidence negating an essential element of defendant's affirmative defense. *Id.* at 323. A genuine issue of material fact exists if the evidence would allow a reasonable jury to return a verdict for the nonmoving

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As such, the court should view all facts and evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixon Bros. Inc.*, 453 F. 3d 283, 285 (5th Cir. 2006).

The nonmovant's failure to respond to the motion for summary judgment does not entitle the movant to default judgment. *Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988). This is because summary judgment requires the movant to show both that no genuine dispute of material fact exists and that the movant is entitled to judgment as a matter of law, rather than as a technicality or procedural default. *Hetzel v. Bethlehem Steel Corp.*, 50 F. 3d 360, 362 n.3 (5th Cir. 1995). Nevertheless, in the absence of an opposition to summary judgment, the court may deem the movant's statement of facts as undisputed and relegate the nonmovant to its unsworn pleadings, which do not constitute proper summary judgment evidence. *Loeber v. Bay Tankers, Inc.*, 924 F. 2d 1340, 1345 (5th Cir. 1991) (per curiam), cert. denied, 502 U.S. 819 (1991); *see also* Fed. R. Civ. P. 56(e). Furthermore, "the court has no obligation to sift through the record in search of evidence to support the nonmovant's opposition to the motion for summary judgment." *Morgan v. Fed. Exp. Corp.*, 114 F. Supp. 3d 434, 437 (5th Cir. 2015) (internal quotes omitted).

## III. Analysis

### A. Sycamore's Claims Against Marilyn Epstein and Beit Nes on the Loan and Guaranty

Sycamore moves for summary against Marilyn Epstein and Beit Nes on the Loan and Guaranty. To enforce the Note, Sycamore must prove: (1) Beit Nes signed the Note; (2) Sycamore is the owner of the Note; and (3) a certain balance is due and

owing. *Leavings v. Mills*, 175 S.W.3d 301, 309 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The undersigned finds that the uncontroverted summary judgment evidence, as cited, establishes that Beit Nes signed the Note, Dkt. 52-11, at 1198, Dkt. 52-2, at 13-20; that Sycamore is the holder of the Note, Dkt. 52-2, at 63-67; and that a certain balance is due and owing, Dkt. 52-4, at 199, 241. Beit Nes defaulted on the Note and Deed of Trust when it failed to pay all amounts due at maturity. Dkt. 52-4, at 234-42.

To recover against Marilyn Epstein, Sycamore must prove: (1) the existence of the Note and Guaranty; (2) Marilyn Epstein signed the Guaranty; (3) Sycamore owns the Guaranty, and (4) a balance remains owing on the Note. *Vaughn v. DAP Fin. Serv's, Inc.*, 982 S.W.2d 1, 4 (Tex. App.—Houston [1st Dist.] 1997, no pet.). The summary judgment evidence establishes the existence of the Note and Guaranty and that Marilyn Epstein signed the Guaranty, Dkt. 52-2, at 13-20, 58-62. The summary judgment evidence further establishes that Sycamore owns the Guaranty, Note, Deed of Trust, Dkt. 52-2, at 6-7, 63-67; and that a balance remains owed on the Note, Dkt. 52-2, at 10.

To recover on a post-foreclosure deficiency, Sycamore must show: (1) the amount due at foreclosure; (2) the foreclosure was valid; and (3) credit was given for the sale amount. *Thompson v. Chrysler First Bus. Credit Corp.*, 840 S.W.2d 25, 28 (Tex. App.—Dallas 1992, no writ). After Beit Nes's default, Sycamore then exercised its power of sale to foreclose on St. Stephens and timely appointed the substitute trustee authorized to conduct the sale, which was properly and timely noticed, filed, and posted. Dkt. 52-2, at 9-10. Sycamore purchased St. Stephens at the sale and

credited Beit Nes's indebtedness. Dkt. 52-2, at 10. Further, Marilyn Epstein was notified of the amount due but failed to pay it. *Id.*

There are no factual disputes on the above. Sycamore has thus established all the elements required to prove its deficiency claim, entitling it to summary judgment against Beit Nes and Marilyn Epstein for $1,021,527.90, plus $381,029.94 in default interest through June 3, 2021, plus $30,060.00 in other post-foreclosure expenses, for a total of $1,432,617.84, excluding legal fees. Dkt. 52-2, at 10, 15 (stating that in the case of default, the borrower agrees to pay the costs and expenses of enforcing the Note). The undersigned also finds that based on the summary judgment evidence that Sycamore is entitled to an award of reasonable attorneys' fees to be determined in accordance with Fed. R. Civ. P. 54(d). Dkt. 52-2, at 15 (stating that in case of default, the borrower agrees to pay the expenses of enforcing the note, including reasonable attorneys' fees).

### B. Defendants' Quiet Title Counterclaim

Sycamore next moves to dismiss Defendants' quiet title claim, which is set out in their Second Amended Complaint in *Epstein et. al. v. 5AIF Sycamore 2, LLC*, No. 1:19-CV-495-RP, at Dkt. 30. A suit to quiet title seeks to remove an encumbrance on the claimant's title and, if successful, renders that encumbrance invalid or ineffective. *Dauz v. Valdez*, 571 S.W.3d 795, 812 (Tex. App.—Houston [1st Dist.] 2018, no pet.). A plaintiff asserting a quiet title claim must show that: (1) she has an interest in a specific property; (2) title to the property is affected by a claim by the defendant; and (3) that claim, although facially valid, is invalid or unenforceable. *See Vernon v.*

*Perrien*, 390 S.W.3d 47, 61 (Tex. App.—El Paso 2012, pet. denied). A plaintiff in a suit to quiet title has the burden to establish—as an element of her claim—that she owns an interest in specific property. *See Heirs of Garcia v. Parr*, No. 04-12-00767-CV, 2014 WL 3928602, at *8 (Tex. App.—San Antonio 2014, pet. denied). Although suit to quiet title relies on the invalidity of a defendant's claim, a plaintiff in a suit to quiet title must prove and recover on the strength of her own title, not the weakness of the defendant's title. *See DTND Sierra Inv., L.L.C. v. Deutsche Bank Nat'l Trust Co.*, No. 04-12-00817-CV, 2013 WL 4483436, at *3 (Tex. App.—San Antonio Aug. 21, 2013, pet. denied); *Fricks v. Hancock*, 45 S.W.3d 322, 327 (Tex. App.—Corpus Christi 2011, no pet.).

In this case, Marilyn Epstein maintains that St. Stephens is her homestead, and that the Epsteins were told they would not give up their homestead status in St. Stephens and were unaware of the true nature of the documents they were signing at the time of the Loan. Thus, she asserts that the Deed of Trust is void. *Epstein et. al. v. 5AIF Sycamore 2, LLC*, No. 1:19-CV-495-RP, at Dkt. 30, at 16-17.

The Texas Constitution protects the homestead from seizure and encumbrances except in a narrow range of circumstances. *See* Tex. Const., art. 16, § 50. The party seeking homestead protection has in initial burden to establish homestead status. *In re Saldana*, 531 B.R. 141, 156 (Bankr. N.D. Tex. 2015). To do this, "the claimant must have a possessory interest in the homestead he or she is claiming." *Id.* But mere ownership or possessory interest is not of itself sufficient to establish a homestead. *Id.* "A claimant must show both: (1) overt acts of homestead

usage; and (2) the intention on [her] part … to claim the land as a homestead." *Id.* What constitutes sufficient overt acts depends on the degree to which the acts reflect the claimant's subjective intent to make the property a homestead. *Matter of Claflin*, 761 F.2d 1088, 1091 (5th Cir. 1985). Mere subjective intent without overt acts evidencing that intent is insufficient to establish a homestead. *Id.* "Once property is designated as homestead property, it can lose that character only through abandonment, death, or alienation." *Thomas v. Graham Mortg. Corp.*, 408 S.W.3d 581, 588 (Tex. App.—Austin 2013, pet. denied). Abandonment requires discontinuance of the property's use plus intent to permanently abandon the homestead. *Resolution Trust Corp. v. Olivarez*, 29 F.3d 201, 207 & n.7 (5th Cir. 1994). Alienation occurs when the title is transferred to another. *Id.* at 206-07. Sycamore here established through its summary judgment evidence that Defendants alienated, abandoned, and transferred the title to St. Stephens negating its homestead status.

There is no evidence that St. Stephens was the Epsteins' homestead in September 2017, at the time of the Loan. The Epsteins abandoned St. Stephens in 2007 when they moved to Stonecliff, where they have since lived. Dkt. 52-7, at 723. The Epsteins then sold St. Stephens in August 2011, which was an undisputed alienation of St. Stephens. Dkt. 52-6, at 552-53. The Epsteins repurchased St. Stephens in 2013 and allege it became their homestead again by September 2017. Dkt. 52-7, at 644-50.

Because of the 2011 alienation, the Epsteins bear the burden to provide evidence of: (1) overt acts of homestead usage; and (2) the intent to claim St. Stephens

as their homestead. First, the Epsteins have submitted no evidence they used St. Stephens as their homestead from 2013 to September 2017, and Defendant's evidence establishes the contrary. The Epsteins purchased Stonecliff in 2007, where they moved their family and have both lived continuously until November 2020, never moving back into St. Stephens. Dkt. 52-7, at 726-27. Marilyn Epstein testified that St. Stephens was occupied by a tenant in 2015, and that they were trying to sell the property during this time. Dkt. 52-6, at 555-56. The Epsteins also leased St. Stephens from May 2017 to April 2018. Dkt. 52-6, at 587-88. The undisputed evidence shows no overt acts by the Epsteins for over a decade to use St. Stephens as their homestead.

Second, the overwhelming evidence establishes no intent on the part of the Epsteins to claim St. Stephens as their homestead. The evidence shows their actual intent from 2011 through 2017 was to save Stonecliff by selling St. Stephens or borrowing funds to upgrade it for a future sale. Dkt. 52-7, at 610-12, 617. Just after defaulting on their Stonecliff loan and facing foreclosure, the Epsteins sold St. Stephens in August 2011. Dkt. 52-6, at 552-53. Then, after regaining St. Stephens in 2013, the Epsteins again tried to sell St. Stephens and even sued Nationstar in April 2015 for interfering with its potential sale. Dkt. 52-6, at 552-54; Dkt. 52-7, at 675-77, 704-05. In that suit, the Epsteins declared their intent to save Stonecliff, their "homestead," by selling St. Stephens, which efforts continued while that suit was active from 2015 to May 2017. Dkt. 52-4, at 250-59. Then, the Nationstar settlement in May 2017 gave the Epsteins what they wanted: a "lower interest long term loan on

7519 Stonecliff" and the ability to sell St. Stephens "for top dollar." Dkt. 52-7, at 682, 676-77, 705, 708.

There is no evidence that they ever considered selling Stonecliff, where they lived, to save St. Stephens. Further, none of the information provided to Lusk and 5 Arch, shows that the Epsteins were living in or intended to live in St. Stephens. Dkt. 52-6, at 503-39. Rather, the relevant evidence refers to Stonecliff as their primary residence where they lived, indicating their actual intent to eventually sell St. Stephens. Dkt. 52-7, at 704-05.

The Epsteins' subjective intent must be discerned from their actual conduct and statements, not unsupported, self-serving statements. *See, e.g., Hinton v. Uvalde Paving Co.*, 77 S.W.2d 733 (Tex. Civ. App.—1934, writ ref'd) ("The existence, whether or not, of a homestead estate in property, must be determined from obvious facts, such as the use made of property, and cannot rest alone on intention or upon an asserted claim unaccompanied by any supporting fact or circumstance."). Here, the undisputed evidence proves that after they regained St. Stephens in 2013, the Epsteins did not engage in any overt acts to make it their homestead. Summary judgment in Sycamore's favor is proper on this basis.

Moreover, the Epsteins also abandoned St. Stephens as their homestead. "The question of whether a person abandoned a homestead interest involves factual determinations." *In re Estate of Navarro*, No. 04-16-00351-CV, 2017 WL 2457080, at *3 (Tex. App.—San Antonio June 7, 2017, pet. denied) (mem. op.). The facts in this case are unconstested. The best evidence of abandonment is that a new and

permanent home has been acquired and occupied. *In re Comu*, 542 B.R. 371, 385 (Bankr. N.D. Tex. 2015) (citing *Coury v. Prot*, 85 F.3d 244, 254 (5th Cir. 1996)). This "could include the acquisition of another home, removal of the family from one dwelling to another, its occupancy and use as a homestead, and an absence of acts evidencing an intention to return to the former home." *Coury*, 85 F.3d at 254; *see also In re Comu*, 542 B.R. at 385.

Here, in 2007 the Epsteins purchased Stonecliff, where they moved their family and have lived continuously, while St. Stephens was either sold, rented, or posted for sale. As discussed above, no facts of their conduct or statements show their intent to reclaim St. Stephens as their homestead, but instead show the opposite intent to save Stonecliff by selling St. Stephens. Sycamore has met its burden to prove abandonment such that St. Stephens was not the Epsteins' homestead in September 2017.

St. Stephens also lost its homestead status when the Epsteins voluntarily conveyed it to Beit Nes on September 14, 2017. Dkt. 52-2, at 56-7. "When a homestead is conveyed to a corporation, the stock of which is owned by the grantors, the property loses its homestead character regardless of whether the grantors continue to occupy the property." *In re Perry*, 345 F.3d 303, 311 (5th Cir. 2003). The Epsteins lost their alleged homestead status as a matter of law when they transferred title to Beit Nes, and summary judgment for Sycamore is proper on this additional basis.

The Epsteins are also estopped from claiming St. Stephens as their homestead because of the express disclaimers and because 5 Arch did not know of their purported

use of the property. A lender may rely upon a non-homestead affidavit if it is without knowledge of the borrower's right to claim a homestead and the borrower is not in actual use and possession of the property. *In re Cadengo*, 370 B.R. 681, 696 (Bankr. S.D. Tex. 2007); Tex. Const. art. 16, § 50(d). "[A] change in residence coupled with a disclaimer of the homestead may form the basis of a claim of abandonment by estoppel." *Thomas*, 408 S.W.3d at 589-90. Here, in the Homestead Disclaimer, Business Purpose Affidavit, and Deed of Trust, Marilyn Epstein disclaimed St. Stephens as her family's homestead and instead declared it was Stonecliff. Dkt. 52-2, at 50-53. This matched her earlier statements, especially in the LOE, where she stated that Stonecliff was purchased as their homestead and is "where I live." Dkt. 52-8, at 894-99. Additionally, the information received showed St. Stephens, which the Epsteins were trying to sell, as almost empty and in various stages of renovation and disrepair. Dkt. 52-7, at 785-89. 5 Arch relied on both the formal disclaimers and the other information received during underwriting in deciding to make the Loan. Dkt. 52-2, at 50 (stating "Borrower, as a business entity, does not have a homestead. Affiant now uses, occupies, and claims the following property … as legal homestead 7519 Stonecliff Dr."). Nothing indicated to 5 Arch that the Epsteins were using St. Stephens as their home. 5 Arch was thus justified in relying on Marilyn's disclaimers, and the Epsteins are estopped from now claiming the opposite to claim St. Stephens as their constitutionally protected homestead.

The undersigned finds that the summary judgment evidence establishes that St. Stephens was not the Epsteins' homestead during the relevant period and that

the foreclosure was valid along with the corresponding substitute trustee's deed. The undersigned recommends that the Court grant summary judgment in favor of 5AIF Sycamore 2, LLC, and find that St. Stephens was not the Epsteins' homestead in September 2017, and that the subsequent foreclosure of St. Stephens and transfers were valid as a matter of law.

### C. Fraud

Defendants allege that Byron Lusk and Spencer Weaver, as agents for 5 Arch/Sycamore, made the following false statements to Marilyn to induce her to enter into the Loan, namely that:

1. Transferring St. Stephens to Beit Nes would not affect the Epsteins' homestead rights and that the Epsteins could continue to reside at St. Stephens after the Loan was made;

2. Sycamore would extend the Loan term for six months or refinance the Note at the end of the one-year term;

3. Prior to the Loan's maturity, Marilyn should not get another lender to refinance the Note because Sycamore would refinance the Note; and

4. The nature of the transaction was commercial, not residential, in order to circumvent the homestead equity lien provisions of the Texas Constitution.

*Epstein et al v. 5AIF Sycamore 2, LLC*, No. 1:19-cv-000495-RP. Dkt. 30. Based on the above, Defendants assert claims for common-law fraud, fraudulent inducement, and statutory fraud, claiming $1 million in lost equity when Sycamore foreclosed on St. Stephens.

To prevail on a claim of common-law fraud, Defendants must prove: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without

any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *E.g., In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001). Fraudulent inducement has the same elements as common-law fraud, plus Defendants must show that they were fraudulently induced to enter into a binding agreement. *See Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 557 (Tex. 2019).

Defendants' fraud claims fail as a matter of law. First, Defendants' fraud claims based on the alleged promises to extend or refinance the Note fail for lack of evidence. A representation about a future event is merely an opinion or prediction, not an actionable misrepresentation. *See Bryant v. Transcont'l Gas Pipe Line Co.*, 821 S.W.2d 187, 190 (Tex. App.—Houston [14th Dist.] 1991, writ denied). To prove a false promise of future performance, the plaintiff must show the defendant made a promise with no intention of performing it. *E.g., Int'l Bus. Machs. Corp. v. Lufkin Indus.*, 573 S.W.3d 224, 228 (Tex. 2019). Defendants allege two misrepresentations regarding future events: (1) a pre-closing promise that 5 Arch would extend or refinance the Note when the term ended; and (2) a pre-maturity promise that 5 Arch would refinance the Note. Defendants have submitted no evidence that 5 Arch made these alleged promises with no intention of performing them. To the contrary, 5 Arch actually considered a Note extension and/or refinance, but declined both when it received updated appraisals showing a lower value for St. Stephens. Dkt. 52-2, at 7-9; Dkt. 52-3, at 109-148. Defendants' fraud claims fail on these grounds.

Second, Defendants' fraud claims fail because the alleged misrepresentations do not qualify as false statements of fact sufficient to support the second element of fraud. Generally, a representation about a point of law or the legal effect of a document is a statement of opinion, not an actionable misrepresentation. *Cheung-Loon, LLC v. Cergon, Inc.*, 392 S.W.3d 738, 746 (Tex. App.—Dallas 2012, no pet.). Exceptions to this rule include representations: (1) made by a party having superior knowledge who takes advantage of another's ignorance; (2) made as to legal rights where there is a fiduciary or confidential relationship; and (3) regarding legal rights if it was both intended and understood to be a representation of fact. *Id.* at 746. The last exception does not apply if the parties are in an equal bargaining position with equal access to legal advice. *Id.*

Defendants allege false statements about: (1) the legal effect of transferring St. Stephens to Beit Nes; and (2) the characterization of the loan as commercial to avoid homestead protections. Because both of the alleged misrepresentations are about the legal effect of the transfer and loan transaction, Defendants must provide evidence of one of the exceptions. *See id.* The first two exceptions do not apply. *See K3C Inc. v. Bank of Am., N.A.*, 204 F. App'x 455, 461 (5th Cir. 2006) (no fiduciary relationship between borrower and lender). There is also no evidence that Lusk or Weaver had any superior knowledge about Texas homestead protections; to the contrary, the summary judgment evidence establishes neither is familiar with Texas home equity loans. Dkt. 52-7, at 744. Finally, both parties were in an equal bargaining position with equal access to legal advice. In August 2017, Marilyn Epstein was already

20

planning to use an LLC as the borrower and had so informed her title attorney to prepare the transfer to Beit Nes. Dkt. 52-7, at 706. Marilyn Epstein had access to an attorney and could have sought legal advice about the effect of title transfer to Beit Nes when she asked her attorney to prepare it. Marilyn Epstein represented on several occasions that she has extensive real-estate experience and regularly uses LLCs in her transactions Dkt. 52-6, at 543-45. There is no evidence that 5 Arch had any superior knowledge or unequal bargaining power.

Defendants have submitted no summary judgment evidence of their claims that Lusk or Weaver's representations about the loan's effect on the Epsteins' purported homestead are fraudulent. The undersigned finds that 5AIF Sycamore 2, LLC is entitled to summary judgment on Defendants' fraud counterclaim on this additional ground.

To prove fraud, Defendants must also prove they actually and justifiably relied on the false representations. *E.g., Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 423-24 (Tex. 2015). Defendants' fraud claims also fail because Defendants could not have justifiably relied on the alleged statements about the effect of the transfer on their purported homestead status, ability to live at St. Stephens, or the commercial nature of the loan because these alleged statements directly contradict the terms of the loan documents. "[A]s Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Id.* at 424-25. "In this regard, a party to an arm's length transaction must exercise ordinary care and reasonable diligence

for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citation omitted). "Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Id.* & n. 3 (citing cases); *see also Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 558 (Tex. 2019) (justifiable reliance elements may be negated as a matter of law when circumstances exist under which reliance cannot be justified). Here, the Deed of Trust, Homestead Affidavit and Disclaimer, and Business Purpose Affidavit Marilyn Epstein signed at closing directly contradict Weaver and Lusk's allegedly false statements. Dkt. 52-2, at 27, 45, 50-55. Each of these documents unambiguously state that the Loan is commercial in nature and that St. Stephens is not the Epstein's residence or homestead.

Moreover, the information Marilyn Epstein provided to Lusk and Weaver, contradicts their alleged false statements. It was she who represented that the property was not her residence and that Stonecliff was her homestead. Defendants' cannot have justifiably relied on Lusk and Weaver's alleged statements under these circumstances. Finally, the evidence negates Defendants' justifiable reliance on alleged promises to extend or refinance the Loan since the Note does not contain any renewal or extension options, and states that it can only be modified in writing. Dkt. 52-2, at 13-20. Therefore, Defendants are unable to provide any evidence or create

fact issues that their reliance was justifiable when the unambiguous loan documents and Marilyn Epstein's own statements contradict those alleged misrepresentations.

Lastly, as for Defendants' fraud counterclaims, Defendants' allegations regarding promises to extend or refinance the Note are also barred by the statute of frauds because the alleged promises are not in writing. *See* Tex. Bus. & Com. Code § 26.01(a) (promise regarding a debt must be in writing). Additionally, Section 11 of the Note states that it "may not be modified, amended, waived, extended, [or] changed … orally … but only by an agreement in writing signed by the party against whom enforcement … is sought." Dkt. 52-2, at 16. When an oral agreement is rendered unenforceable by the statute of frauds, a party cannot sustain a fraud claim by merely alleging that the other party made an oral promise without the intention of performing it. *See McClure v. Duggan*, 674 F. Supp. 211, 221 (N.D. Tex. 1987). Because the alleged fraud was oral and not in writing, summary judgment is proper on this additional basis.

Defendants' Section 27.01 statutory fraud claim also fails because the Loan does not involve the sale or transfer of real property. Section 27.01 "applies only to fraud in real estate or stock transactions." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343 (5th Cir. 2008) "A loan transaction, even if secured by land, is not considered to come under the statute." *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied). Defendants' statutory fraud claim fails as a matter of law because the statute does not apply to the Loan in issue.

### D. Wrongful Foreclosure

Defendants also plead a claim of wrongful foreclosure. The elements of a wrongful foreclosure claim are: (1) a defect in the foreclosure proceedings; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price. *E.g., Foster v. Deutsche Bank Nat'l Tr. Co.*, 848 F.3d 403, 406 (5th Cir. 2017). Defendants allege that the foreclosure sale was defective because Sycamore did not first obtain a Rule 736 order permitting foreclosure of St. Stephens. This argument fails.

Defendants presume that the Loan should qualify as a Section 50(a)(6) home-equity loan because St. Stephens was their homestead. The undersigned has found as a matter of law that St. Stephens was not the Epsteins' homestead in 2017. And even if it were, neither the Note nor the Deed of Trust purport to be subject to Section 50(a)(6). Dkt. 52-2, at 13-20. The Deed of Trust grants Sycamore the power of non-judicial foreclosure and to foreclose Sycamore needed only to provide the required notices, which it did. *Univ. Savings, Ass'n v. Springwoods Shopping Ctr.*, 644 S.W.2d 705, 706 (Tex. 1982). There was no defect and therefore summary judgment is proper on Defendants' wrongful foreclosure claim.

### E. Declaratory Relief

Lastly, Defendants make a claim for declaratory relief. The Declaratory Judgment Act is a procedural device: it creates no substantive rights and requires the existence of a justiciable controversy. *Lowe v. Ingalls Shipbuilding, Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984). Thus, the DJA can provide no relief to a plaintiff unless a

justiciable controversy exists between the parties. *See Kazmi v. BAC Home Loans Servicing, L.P.*, No. 4:11-CV-375, 2012 WL 629440, at *15 (E.D. Tex. Feb. 3, 2012); T*urner v. AmericaHomeKey Inc.*, No. 3:11-CV-0860-D, 2011 WL 3606688, at *5 (N.D. Tex. Aug. 16, 2011) (explaining that DJA is "merely a vehicle that allows a party to obtain an early adjudication of an actual controversy arising under other substantive law"). Because the undersigned has found summary judgment appropriate on all of Defendants' claims, there is no controversy between the parties to support declaratory relief. Accordingly, this claim fails.

## IV.    Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** that the District Court **GRANT** Plaintiff's Motion for Summary Judgment, Dkt. 52, and enter judgment in favor of 5AIF Sycamore 2, LLC, against Defendants Beit Nes, LLC and Marilyn Roth Epstein for a total of $1,432,617.84, plus interest accrued through the date of judgment, along with reasonable attorneys' fees. The undersigned **FURTHER RECOMMENDS** that Defendants Beit Nes, LLC, Marilyn Roth Epstein, and Stephan B. Epstein take nothing on their counterclaims and that the Court enter summary judgment in favor of 5AIF Sycamore 2, LLC, on those claims. **IT IS FURTHER ORDERED** that this case be removed from the Magistrate Court's docket and returned to the docket of the Honorable Robert Pitman.

## V.    Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to

which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

**SIGNED** January 6, 2022.

_____
DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE